UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| JAMES LUTCHER NEGLEY, | |
| Plaintiff, | |
| v. | Civil Action No. 15-1004 (JEB) |
| U.S. DEPARTMENT OF JUSTICE, | |
| Defendant. | |

### MEMORANDUM OPINION

In 1995, The Washington Post printed a manifesto written by a domestic terrorist who came to be known as the Unabomber. The day after publication, Plaintiff James Lutcher Negley walked into a library at California State University (Chico) and — in a fateful request — offered the librarian twenty dollars to leave a copy of the article at his hotel. Apparently unnerved by the interaction, the librarian called the UNABOM Hot Line and reported Negley's request. The FBI then interviewed Plaintiff and conducted a brief investigation before quickly clearing him of any involvement with the Unabomber. As far as the Bureau was concerned, all inquiries related to Negley ended there. Wishful thinking indeed.

For Plaintiff, those interviews have prompted more than two decades of litigation under the Freedom of Information Act, as he has tried to ascertain the scope of the FBI's interest in him. Over the years, the Bureau has released 163 documents related to its investigation of Negley, as well as thousands of pages related to his FOIA requests (and the subsequent litigation). This latest suit, however, concerns a single handwritten notation on one released document, a cover sheet for a fax sent in 2002. That notation referred, opaquely, to a file with "500,000 pp" and "42,000" of "misc. evidence," which Plaintiff assumes indicates that there are

1

at least 500,000 more responsive pages related to his case.  On April 7, 2014, he submitted a FOIA request seeking a copy of the file with said 500,000 documents.  The FBI, in turn, reported that the relevant file did not concern him, but related more broadly to the UNABOM investigation as a whole.

Still skeptical, Plaintiff brought suit in this Court, arguing principally that Defendant Department of Justice had failed to conduct an adequate search for the specified file.  The agency now moves for summary judgment, affirming that it has, in fact, located the "500,000 pp" file and that it contains no new information related to Negley.  Agreeing, the Court will grant the Government's Motion, thereby putting a *coda* on this decades-long saga.

**I.     Background**

To understand the agency's search efforts (and the mysterious 2002 fax notation at issue), the Court must begin with a deep dive into Negley's previous three FOIA requests and the rather serpentine litigation that followed.  In so summarizing, the Court draws from seven previous judicial decisions related to Negley, before turning to Plaintiff's latest FOIA request.

    A.     October 7, 1999, Request

On October 7, 1999, Negley submitted his first FOIA request, seeking all records concerning him maintained at the FBI's field office in Sacramento, California (whose jurisdiction includes the Chico State library).  See Negley v. DOJ (Negley I), No. 01-57 (W.D. Tex. 2002), ECF No. 26 (Report & Recommendation).  After some prodding, the agency located 51 pages of responsive material, ultimately releasing 50 in whole or in part.  Id. at 1-3.  Those documents included investigative reports from the CSU police along with notes from Plaintiff's interviews with detectives.

In 2001, Negley filed suit in the Western District of Texas, challenging (1) whether the FBI was withholding additional records; and (2) whether withholding one page (along with various redactions to the released pages) fell within applicable FOIA exemptions. Id. at 3. In a 2002 declaration, Special Agent and Chief Division Counsel Brian Callihan outlined that the FBI had retrieved three relevant files:

- **File 149A-SF-106204 (the San Francisco File)** – The file was maintained by the San Francisco field division. Agent Callihan reported that "<u>this file contains approximately 500,000 pages of material and approximately 42,000 pages of additional material including evidence</u>." "While there is some information referencing Mr. Negley in this file, the complete file does not pertain to him."

- **File 149A-SC-C27507** – The file was "opened within the Sacramento Field Office in order to contain information pertaining to possible 'Unabomb' suspects" in the office's territory. It "contains information on a large number of other individuals," only a "small portion" of which pertained to Negley.

- **190-SC-33911** – An internal administrative file regarding FOIA requests, which included correspondence between the FBI and Negley

See ECF No. 55-15 (Declaration of Denise Swain), Exh. A (Callihan Declaration), ¶¶ 7-9 (emphasis added). A magistrate judge found that search sufficient and determined that of the pages released, the FBI had appropriately deleted "only names, addresses, phone numbers, and other such identifying information" pursuant to Exemption 7(C). See R&R at 10-11. The judge also reviewed *in camera* the one page withheld in full, which related to the FBI's "private" conversation with the library employee, and found the withholding proper under Exemption 7(D). Id. at 10. The district court adopted that Report & Recommendation in full, granting summary judgment for the Bureau. See No. 01-57, ECF No. 29 (Judgment).

B. <u>January 16, 2002, Request</u>

On January 16, 2002, Negley filed another FOIA request, this time seeking any records maintained at the San Francisco Field Office and, more specifically, found within the

aforementioned File 149A-SF-106204. See Negley v. FBI, 169 Fed App'x 591, 593 (D.C. Cir. 2006). By letter dated September 30, 2002, the Department informed Negley (once again) that, although he is not the subject of any "main file" in San Francisco, he is "mentioned briefly" in that office's file, "the subjects of which are other individuals or organizations." Id. The letter went on to explain that the relevant records in the San Francisco File were merely duplicates of records Negley had previously obtained from the Sacramento office. Id. Even so, the Bureau eventually made available 46 pages, all of which had previously been released, while withholding the same one page at issue in Negley I. Id.

Negley brought suit once more, this time filing in the federal court here before now-retired Judge Gladys Kessler. Although it took the FBI more than a few tries, see, e.g., id. at 593-94 (reversing grant of summary judgment); Negley v. FBI, 658 F. Supp. 2d 50, 60 (D.D.C. 2009) (denying summary judgment), the agency ultimately released an entire sub-file of the San Francisco File, which included nine more responsive pages. Judge Kessler granted the agency's third motion for summary judgment, though not before chastising it for "stonewall[ing], . . . delay[ing], [and] repeatedly [finding] responsive documents long after it should have." Negley v. FBI (Negley II), 825 F. Supp. 2d 63, 65 (D.D.C. 2011). The D.C. Circuit affirmed and later denied rehearing *en banc*. See 2012 WL 1155734 (D.C. Cir. March 28, 2012).

    C.    June 15, 2009, Request

Undeterred, Plaintiff submitted a third FOIA Request to the FBI on June 15, 2009. Wary of leaving any loopholes, he sought a "copy of all records in its possession relating, in any way, to James Lutcher Negley" or his business. See Negley v. FBI (Negley III), 2013 WL 12099972, at *1 (W.D. Tex. 2013). The Bureau, which had "undertaken no new investigative activity of the Plaintiff since 1995," had little new to report. Id. In all, it released 77 pages related to the

4

investigation, all of which had been previously released.  Id.  It also processed 7,427 pages of documents linked to FOIA-related litigation with Negley, releasing 2,288 pages thereof.  Id.

Negley once again filed suit, now back in the Western District of Texas.  Notably, he did not challenge Defendant's decision to withhold or redact any uncovered documents.  Id. at *2.  He instead latched onto a handwritten notation on one of the released documents — a January 22, 2002, fax cover sheet related to the Negley I litigation.  Id. at *3.  In the right-hand margin, a handwritten note appears to read: "per 1 [Redacted]; 1/17/02; case is still pending; 500,000 pp. in file; 42,000 misc; evidence."  For reference, the Court reproduces a copy below:



See Compl., Exh. B. In light of that notation, he contended that "there might [be] nearly 500,000 pages of documents that are possibly related to him and that the FBI should be required to turn them over." Negley III, 2013 WL 12099972, at *3.

The agency responded that all documents pertaining to Negley had already been produced, and the district court agreed, crediting Hardy's declaration that "there were only 163 pages [including duplicates] produced in the investigation and that no document regarding plaintiff was of that great of a size." Id. It therefore rejected as "speculative" Negley's theory that the 500,000 pages related to him and denied his request for additional discovery. Id., aff'd, 589 Fed App'x 726 (5th Cir. 2014).

### D. April 7, 2014, Request

That brings the Court to Negley's fourth FOIA request — dated April 7, 2014 — which is the subject of the instant litigation. See Compl., ¶ 15. This request, filed with the Department of Justice, targeted the aforementioned fax cover sheet, seeking "a copy of the file referenced in the handwritten notes" therein. See Compl., Exh. C (Fourth FOIA Request). At first, the Department (apparently failing to link this request to past litigation) was confused by the reference. By letter dated May 30, 2014, it responded that the "2002 hand-written notation does not indicate or cite to any specific FBI file." ECF No. 55-2 (First Declaration of David Hardy), Exh. B. Because FOIA only provides access to records "reasonably described," the agency asked for more specific information about the files sought. Id. (quoting 5 U.S.C. § 552a(a)(3)(A)).

After receiving a follow-up letter from Plaintiff, however, the Department apparently "reexamined [his] request in light of ongoing and prior litigation pertaining to Mr. Negley." First Hardy Decl., Exh. D. To wit, a paralegal in the USAO of the Western District of Texas

6

pulled the original file for Negley I to see if she could locate the January 22, 2002, fax. See Swain Decl., ¶ 12. While looking at the pleadings in that case, she uncovered the aforementioned declaration from Division Counsel Brian Callihan. Id. As the savvy reader might remember, that declaration described the SF-106204 file (later at issue in Negley II) and indicated it "contain[ed] approximately 500,000 pages of material and approximately 42,000 pages of additional material including evidence." Callihan Decl., ¶ 7. The Declaration was signed on January 23, 2002, only one day after AUSA David Castillo sent the fax to Callihan about the same litigation. Id. at 3; see also Swain Decl., ¶ 12.

Connecting the dots, the Government realized that the handwritten notation must be referring to the whole SF-106204 file. The agency thus responded on August 12, 2014, informing Negley that "the marginal notation refers to the massive UNABOM file in its entirety." First Hardy Decl., Exh. D. It further explained: "[T]he handwritten notation . . . references the same information the FBI provided in a prior declaration in [Negley I]." Id. Given that background, it asked Negley to clarify whether it was "seeking the entire UNABOM file, or a portion thereof," warning that until he did so, no further action would be taken on his request. Id.

Plaintiff sent another letter, expressing disbelief that the "500,000 pp." notation referred to the entire UNABOM file. See First Hardy Decl., Exh. E (August 22, 2014, letter) at 1. He closed by advising that "Mr. Negley does not want the FBI to make an unsolicited copy of some part or all of the UNABOM file." Id. at 2. The FBI then closed the request. On administrative appeal, Plaintiff once again claimed that the FBI had "not proferr[ed] the explanation as to the source of the notation." First Hardy Decl., Exh. G. The Government, having determined there was no outstanding request to fulfill, closed the appeal as well. See First Hardy Decl., Exh I.

Plaintiff then filed suit in this Court, asking that it order "DOJ to conduct a reasonable search for records responsive to his April 2014 FOIA Request." Compl., Requested Relief.

**II.     Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

FOIA cases typically are decided on motions for summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). In a FOIA case, the Court may accept an "agency's affidavits, without pre-summary judgment discovery, if the affidavits are made in good faith and provide reasonably specific detail concerning the methods used to produce the information sought." Broaddrick v. Exec. Office of the President, 139 F. Supp. 2d 55, 64 (D.D.C. 2001). "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other

documents." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citation omitted). "Summary judgment may not be appropriate without *in camera* review," however, "when agency affidavits in support of a claim of exemption are insufficiently detailed." Armstrong v. Exec. Office of the President, 97 F.3d 575, 578 (D.C. Cir. 1996). In such a circumstance, "district court judges [have] broad discretion in determining whether *in camera* review is appropriate." Id. at 577-78.

### III. Analysis

Plaintiff's latest FOIA request sought "the contents of the file referenced" in a 2002 fax cover sheet. See Compl., Exh. C. The Government claims to have found that file and is willing to process its contents — although, as will be discussed, the time to do so would span several generations. Negley has declined the offer. The only relevant question for this Court, then, is whether the Department adequately searched for — and found — the right file. The Court thus begins there, before doing some quick house cleaning as to Plaintiff's remaining arguments. Because it finds the search adequate, it need not wade into the Government's alternative argument that Negley's initial request did not reasonably describe the records sought, see MSJ at 4-6, or that he failed to exhaust administrative remedies. Id. at 6-8; see Nat'l Sec. Counselors v. DOJ, 848 F.3d 467, 571 (D.C. Cir. 2017) ("[A] FOIA requester's failure to exhaust administrative remedies is not [a] jurisdictional bar to review.") (internal quotation marks omitted) (alteration in original).

#### A. Adequacy of Search

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" Valencia-Lucena v. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897

9

F.2d 540, 542 (D.C. Cir. 1990)); see also Steinberg v. DOJ, 23 F.3d 548, 551 (D.C. Cir. 1994). The adequacy of an agency's search for documents under FOIA "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." Weisberg v. DOJ, 745 F.2d 1476, 1485 (D.C. Cir. 1984).

To meet its burden, the agency may submit affidavits or declarations that explain the scope and method of its search "in reasonable detail." Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982) (*per curiam*). The affidavits or declarations should "set[] forth the search terms and the type of search performed, and aver[] that all files likely to contain responsive materials (if such records exist) were searched." Oglesby v. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). Absent contrary evidence, such affidavits or declarations are sufficient to show that an agency complied with FOIA. See Perry, 684 F.2d at 127. "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." Truitt, 897 F.2d at 542.

Here, Plaintiff sent the Government hunting for the "500,000 pp." file referenced in the 2002 fax notation. At the time that fax was sent, Negley and the agency were engaged in their first round of litigation, and "t[h]e fax cover sheet was created for the purpose of transmitting a draft of the declaration between the CDC [Agent Callihan] and [AUSA] handling that litigation." See ECF No. 63-1 (Second Declaration of David Hardy), ¶ 5. To refresh, Callihan's final declaration included the following description of File SF-106204:

> [T]his file contains approximately 500,000 pages of material including approximately 42,000 pages of additional material including evidence. As noted above, the file is maintained by the San Francisco division and remains an open or pending file.

10

See Callihan Decl., ¶ 7. The fax notation, not coincidentally, concerns each of those talking points: 1) the case is still pending; 2) there are 500,000 pages in the file; and 3) there are 42,000 pages of "misc. evidence." Here is the notation itself:



It requires little sleuthing to put the pieces together. On January 22, 2002, AUSA Castillo sent a draft of a declaration to CDC Callihan, and then either he or Callihan added a handwritten notation about the San Francisco File. One day later, Callihan filed his declaration with the same information. The Court therefore credits the Government's claim that it has found the requested file: The "file referenced" in the 2002 fax notation is none other than the San Francisco File.

Plaintiff argues otherwise, insisting the Government has found the wrong file and that there may still be "another massive file on Mr. Negley." ECF No. 65 (Pl. Response) at 1. Notably, however, he focuses the bulk of his fire not on the Department's <u>search</u> for the file but rather on its description of the file's <u>contents</u>. To wit, Negley balks at the agency's assurance that the SF-106204 file is the "massive UNABOM file in its entirety." He wonders how a 17-year investigation, spanning the country, could produce just one file with 500,000 pages.

The Court is sympathetic to his skepticism, as it, too, doubts that the SF-106204 file represents the universe of UNABOM materials. At multiple hearings, it has pressed the Government to provide a more precise description of the UNABOM file, yet each time its counsel has maintained that the SF-106204 file is, in fact, the "entire" UNABOM file. In a

follow-up declaration, the agency refined that stance somewhat. It there explained that nearly all of its 56 Field Divisions were involved in the 17-year UNABOM investigation, "and in 1993, a UNABOM Task Force (UTF) was set up in San Francisco to give overall direction to the investigation." Second Hardy Decl., ¶ 4. This task force investigated more than 2,400 suspects and apparently put together a file that the FBI refers to as "the UNABOM file." Id. At the time the AUSA sent his fax in 2002, he apparently estimated that the file contained 500,000 pages. Id., ¶ 5. Now, after querying its record inventory system — a system not in existence at the time of the Callihan Declaration — the FBI suspects it contains roughly 1.4 million pages. Id., ¶ 6.

The Second Hardy Declaration, while shedding a bit more light on the San Francisco File, still seems a bit imprecise. While the serial 149A-SF-106204 appears to refer to the entire "main" UNABOM file, see Negley v. FBI, 169 Fed App'x at 593, it is certainly not the only UNABOM file. The same Callihan Declaration, for instance, noted that the Sacramento Field Office maintained a separate file for suspects within its jurisdiction. But while this discrepancy is unfortunate — and surely adds fuel to Plaintiff's longstanding suspicion that the FBI is hiding the ball — it is ultimately irrelevant to the legal issues before the Court. The only question the Court must ask is whether, pursuant to Negley's Fourth FOIA Request, the FBI has properly identified the "file referenced" in "a facsimile cover sheet sent . . . on January 22, 2002." Compl., Exh C. On review, it is obvious that the agency has found the elephant Negley has been hunting, and the agency's inconsistencies in describing that file's contents do not cast doubt on that conclusion.

Negley also takes issue with the "heavy redactions that are directly above the line noting that 500,000 pages are in evidence." Pl. Response at 4. He believes that removing such redactions "would assist [him] in determining whether the DOJ's information is sensible." Id.

Yet the agency has sworn in an affidavit that it "was able to locate the un-redacted version of the document" and "no specific FBI file was located beneath the block." First Hardy Decl., ¶ 9. Such "[a]gency affidavits are accorded a presumption of good faith," SafeCard Servs., 926 F.2d at 1201; in any event, the Court finds no reason to believe that the redaction would alter the otherwise obvious conclusion from the face of the fax: the notation refers to the San Francisco File.

Finally, as to Plaintiff's speculation that there may yet be "another massive file" about him, another court previously explained that there is no reason to believe that any file "regarding plaintiff was of that great of a size." Negley III, 2013 WL 12099972, at *4. It therefore rejected as "speculative" his theory that the 500,000 pages of evidence related to him. Id. In this case, Negley reprises much the same argument, cataloguing a long list of harassment he attributes to the FBI — including suspicious persons tailing him and break-ins to his home, car, and office. See ECF No. 59 (Pl. Opp.) at 6-7; id., Exh. A. While Negley may sincerely believe the agency is to blame for these harms (and that there thus must exist more files on him), he has failed to provide any concrete evidence linking these incidents to the FBI. This type of "[m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." SafeCard Servs., 926 F.2d at 1201; see also Flowers v. IRS, 307 F. Supp. 2d 60, 72 (D.D.C. 2004) (noting that while plaintiff "may be unhappy with the search results," that provides no grounds to use FOIA discovery for a fishing expedition). The Court will accordingly grant the Government's Motion for Summary Judgment on that ground.

B.    Production Schedule

As the Government has found the correct file, the only question remaining is whether Plaintiff would like a copy. When pressed by the Court, he answered no, arguing that even were he "to take the government at its word and elect to receive 500,000 (or 1.4 million) pages of the UNABOM file," the FBI's interim release policy would make such efforts impossible. See Pl. Response at 6. Under that policy, the agency would process 500 pages per month, meaning it would take more than 80 years to produce the 500,000 pages at issue here. As Negley is now over age 70, he would be unlikely to see much fruit from any release.

Negley never challenged this policy in his Complaint, but to the extent he can properly raise it now, the Court sees no basis to expedite release. While it agrees such a pace may well be a non-starter for an elderly patient, the D.C. Circuit has recently given its seal of approval to the Government's standard "interim release policy," which provides for "processing requests in 500-page increments." Nat'l Sec. Counselors, 848 F.3d at 471. The policy, the Court of Appeals explained, "provides more pages to more requesters, avoiding situations in which a few, large queue requests" — such as processing the main UNABOM file — "monopolize finite processing resources." Id. at 471-72 (internal quotation marks omitted). "Far from giving rise to an improper inflation of fees that effectively denies access to requesters, the FBI's interim release policy serves to promote efficient responses to a larger number of requesters." Id. at 472 (internal quotation marks omitted); see also Second Hardy Decl., ¶¶ 11-16 (explaining why the same policy concerns apply to release of the UNABOM file).

To be sure, "[a] court . . . may use its equitable powers to require the agency to process documents according to a court-imposed deadline," Clemente v. FBI, 71 F. Supp. 3d 262, 269 (D.D.C. 2014), but Plaintiff has not shown that such steps are necessary here. As the FBI

14

explains in its declaration, he has not "indicated a compelling need for expedited processing of the information," and thus, "the FBI cannot prioritize the processing of a newly submitted request above other requests already made to FBI and often concerning more recent events of significant public interest." Second Hardy Decl., ¶ 10. This is not a case in which the requester has established, for example, (1) an imminent threat to the life or physical safety of an individual, (2) an "urgency to inform the public about an actual or alleged federal government activity," (3) a threatened loss of substantial due process rights, or (4) "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 26 C.F.R. 5.5(e)(1). Rather, Negley merely wants to satisfy his curiosity about the UNABOM investigation and any potential connection to himself. The Court therefore agrees with the agency's assessment that its "standard rate of 500 pages per month" would be appropriate were Negley to seek release of such documents. See Second Hardy Decl., ¶ 10.

### C.      Exemptions

Finally, in his Opposition, Plaintiff purports to challenge the Government's redactions and withholdings for documents released in previous litigation. Typically, an agency must show that any withheld material "falls within one of nine statutory exemptions." People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, 745 F.3d 535, 540 (D.C. Cir. 2014). The rub here, however, is that the Department has not released any material responsive to Plaintiff's April 14, 2016, FOIA request. Rather, Negley has repeatedly declined the agency's offer to produce the UNABOM file.

He nevertheless takes umbrage at pages that the FBI has released as a courtesy during the instant litigation. Specifically, while the litigation was pending, the FBI received "referrals"

15

from the U.S. Attorney's Office for the Western District of Texas (the site of the original 2002 fax). The Office referred 1,519 pages of responsive records, all of which were part of prior FOIA requests and the subject of subsequent litigation. On February 3, 2017, the office made an additional referral, this time with 8 pages worth of emails related to Negley's previous FOIA requests. The FBI advised Plaintiff that those documents had "previously been reviewed, processed, and adjudicated" in Negley III, but that it would provide Plaintiff with another copy as a "courtesy." Pl. Opp., Exh. G (Hardy Letter).

Now, Negley challenges redactions to two groups of those duplicate documents. First, he notes that the FBI produced "21 pages . . . from File 1575," each of which is "heavily redacted." Opp. at 18-20. File 1575 is a sub-file of the San Francisco File and was the subject of extensive litigation before Judge Kessler in Negley II. See 825 F. Supp. 2d at 66-68. In that case, Judge Kessler ordered the Bureau to release the entire sub-file, along with the requisite Vaughn Index justifying any redactions. Id. at 67. The agency did so and there justified withholdings on the basis of Exemption 7(C). Id. at 72. Judge Kessler ultimately agreed such exemptions were proper and granted the Bureau's motion for summary judgment. Id. at 73 ("Defendant has specifically explained that it redacted the names or identifying information of either witnesses, third parties merely mentioned, individuals interviewed by the FBI, or individuals of investigative interest. . . [and] the Court concludes the FBI properly invoked Exemption 7(C)."). Negley cannot now reprise the issue. See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 n.5 (1979) ("[A] judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.").

So, too, for the 8 pages worth of emails. Those materials fall outside his current FOIA request and, in any event, were previously released to Plaintiff in litigation in the Western

16

District of Texas.  The appropriate time to challenge any use of exemptions was before that court.   Yet during that litigation, "Plaintiff did not challenge the exemptions in his response and concede[d] that they are appropriate in his sur-reply."  Negley III, 2013 WL 12099972, at *2.  "Because Plaintiff [did] not contest the exemptions as they apply to the documents uncovered by Defendant," the district court granted the Government's "motion for summary judgment regarding defendant's assertion of exemptions 5, 6, 7(C), and 7(E)."  Id.  The decision, of course, precludes further litigation on the merits.  See Parklane, 439 U.S. at 326 n.5.

**IV.  Conclusion**

For the foregoing reasons, the Court will grant the Government's Motion for Summary Judgment and issue a contemporaneous Order so stating.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  April 3, 2018